IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No. 1:23-CR-108 |
| v. | ) | |
| | ) | The Honorable Rossie D. Alston, Jr. |
| MAKSIM SILNIKAU, | ) | |
| | ) | Sentencing: August 5, 2026 |
| *Defendant.* | ) | |
| | ) | |

## POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

*"Today I am more interested in f\*\*\*ing corporations, locking them, downloading their data and giving them nightmares."*—Maksim Silnikau, April 27, 2022

For approximately two years, the defendant led the Ransom Cartel ransomware gang as it hacked into United States computer networks and extorted the owners. Although the gang's activities ceased in 2023 after the arrest of the defendant, over the lifetime of the conspiracy Ransom Cartel attempted to extort at least $5.2 million[1] from its victims. Identified victims ranged from law firms to medium-sized businesses and from educational institutions to large multinational corporations. The defendant fled Spanish authorities while awaiting extradition to the United States and was apprehended while trying to cross from Poland to his native Belarus. He ultimately consented to extradition, pleading guilty to unrelated charges in the District of New Jersey as well as the charges in this District relating to Ransom Cartel. He now comes before this Court for sentencing for the Ransom Cartel scheme.

The Presentence Investigation Report ("PSR") correctly calculates the Guidelines range as 60 months for Count One (Conspiracy to Commit Damage to Computers, Computer Extortion,

---

[1] All references to the dollar refer to U.S. currency.

and Computer Intrusions) and 235 to 240 months for Count Four (Conspiracy to Commit Wire Fraud). In addition, the defendant shall be imprisoned on Count Six (Aggravated Identity Theft) for a mandatory two-year period to run consecutive to any custodial sentence imposed on the other counts. For the reasons that follow, the United States requests that the Court sentence the defendant to the low end of the Guidelines on Counts One and Four, followed by the term of imprisonment for Count Six. Consistent with the plea agreement, the United States will move to dismiss the remaining counts at the conclusion of the sentencing hearing.

## **BACKGROUND**

Drawing on more than a decade of experience with the cybercrime underground, the defendant founded, organized, and operated the Ransom Cartel conspiracy from 2021 to 2023. PSR at ¶¶ 20, 24-40, 42. On May 4, 2021, on an underground website where Russian-speaking cybercriminals gather to conduct business, one of the defendant's coconspirators launched the conspiracy with the following announcement (translated from the original Russian):

> Will buy access to corporate networks.
> Will buy access to corporate networks in the following countries: US, CA, UK, AU, ZN, EU, and other countries except for CIS [Commonwealth of Independent States].
>
> Access rights: Domain Admin, Local Admin, User
> Revenue: from $10 million
> Prices from $100 and up.
> Not interested in previously sold accesses.
> Will consider working with you on commission (%)
> I conduct all deals only through the guarantor service of this forum. Guarantor service will be paid for by me. [. . .]

PSR at ¶ 25. This solicitation sought additional co-conspirators, also known as initial access brokers, who could provide pre-hacked access to his ransomware gang.[2] The defendant also obtained stolen credentials like account usernames and passwords that could be exploited for further access by his team. PSR at ¶¶ 30-32. After obtaining unauthorized access, the conspiracy would steal data, install its ransomware, lock access to valuable data, then extort the victims, either by refusing to provide the keys to unlock the data or by threatening to publish the stolen data. PSR at ¶ 28. In short, as the defendant admitted, he was "fucking corporations, locking them, downloading their data and giving them nightmares." PSR at ¶ 20. Meanwhile, the defendant and his coconspirators coordinated these activities using a customized website hidden behind the Tor anonymity network. The website facilitated communication between coconspirators and victims, provided access to stolen data, tracked ransom payouts, and was used for payment of commissions. PSR at ¶ 27. The primary objective of the conspiracy was to make money without getting caught. The defendant therefore ensured that ransoms were paid in cryptocurrency, transferred through cryptocurrency "mixers" (obfuscation mechanisms that seek to prevent law enforcement from tracing the fruits of crime), and then eventually to the co-conspirators. PSR at ¶ 29.

Ransom Cartel primarily targeted victims in English-speaking countries and the European Union. As the advertisement made clear, Ransom Cartel would be scrupulous about not attacking

---

[2] Initial access brokers specialize in gaining unauthorized access to computers then selling that access to others who can use it to facilitate their criminal activities, such as data thieves, fraudsters, and extortionists. Access to attractive targets like government, financial services, and industrial and engineering organizations, typically costs more than access to computers used in other sectors, and access to an account or computer having elevated privileges (such as administrative access that can be used to modify or disrupt service) costs more than access to privileges assigned to mere users of a computer. For more information, see CROWDSTRIKE, ACCESS BROKERS: WHO ARE THE TARGETS, AND WHAT ARE THEY WORTH?, https://www.crowdstrike.com/en-us/blog/access-brokers-targets-and-worth/.

victims in the Commonwealth of Independent States. But the defendant's actual targeting was narrower than advertised, initially focusing on at the United States. A few weeks after the advertisement was posted, on June 17, 2021, the defendant told a potential supplier of unauthorized access that "I only want US." PSR at ¶ 28. Ransom Cartel's interest was not primarily in massive companies that would accrue the largest payouts, so he targeted smaller companies lacking the resources of larger, more well-defended companies. PSR at ¶ 25.

The defendant was arrested before Ransom Cartel grew large enough to inflict losses comparable to the largest ransomware variants, which was a victory for the rule of law. Yet Ransom Cartel still wreaked its share of havoc during its two-year duration. Victims suffered severe damage to their systems, with business impacts ranging from days to months, as further described in the victim impact statements attached as Exhibit A (attached under seal). In August 2022, for instance, Ransom Cartel attacked a small medical technology startup, Victim A, that was developing robotic surgical technologies. Ex. A at 2. Although Victim A was not yet profitable, the Ransom Cartel attack crippled the company for two months, forcing it to divert funds to cybersecurity incident response. Not only did the attack set back Victim A's entry into product markets; it also forced the victim to spend scarce resources raising additional investment funds, assuring itself that the patient information it held had not been compromised, and ensuring that there were no back doors to its networks. Ex. A at 2.

Other victims were similarly affected. In May 2023, Ransom Cartel targeted a group of law firms that relied on a common infrastructure provider. As a result of the attack, these firms suffered near-total business interruptions that ranged from a few days to several months. One victim, Victim B, was interrupted for nearly a month until it paid a ransom valued at $125,000. Ex. A at 5. The ransom payment constituted less than half of the total costs to Victim B, as Victim

B was forced to divert employee time and incur numerous additional expenses to pay for lawyers, information technology maintenance, and cybersecurity experts who would hunt down and evict any remaining intruders. Ex. A at 4-5. Another firm, Victim C, suffered damage so severe that it suspended business operations for nearly a month until it paid a ransom valued at $300,000. The total losses caused by these attacks went well beyond just the cost of the ransom, reaching a total of approximately $2.2 million. Ex. A at 13-14.

In total, the United States has identified more than $6.7 million in total realized losses inflicted by Ransom Cartel on just 18 victims. PSR at ¶ 46. This number is conservative, as it does not include losses sustained by as-yet-unidentified victims, many of whom have likely not reported the attacks to law enforcement. In addition, many of the identified victims have not submitted restitution requests.

<h3 align="center">THE GUIDELINES</h3>

The PSR correctly calculates the Guidelines. Counts One and Four group for the purposes of determining the offense level under U.S.S.G. §§ 2X1.1 and 2B1.1. As reflected in the PSR, paragraphs 50 through 58, the applicable range is calculated as follows:

| Guideline(s) | Description | Offense Level |
|---|---|---|
| 2B1.1(a)(1) | Base offense level for 18 U.S.C. § 371 and | 7 |
| 2B1.1(b)(1) | Loss exceeding $3,500,000 | +18 |
| 2B1.1(b)(2) | 10 or more victims | +2 |
| 2B1.1(b)(10) | Relocating scheme to another jurisdiction / sophisticated means | +2 |
| 2B1.1(b)(11) | Trafficking in unauthorized access devices | +2 |
| 2B1.1(b)(18) | Obtaining personal information | +2 |
| 2B1.1(b)(19)(A)(ii) | Conviction under 18 U.S.C. § 1030(a)(5)(A), concerning intentional damage to a computer | +4 |

The PSR correctly applied a four-level adjustment because the defendant was an organizer or leader of the Ransom Cartel gang. PSR at ¶ 60. The PSR correctly notes that there is no offense

5

level for Count Six, which carries a two-year mandatory prison sentence that must run consecutive to a custodial sentence imposed under another section. Accordingly, the grouping rules do not increase the offense level based on the group for Count Six, resulting in a combined adjusted offense level of 41. PSR at ¶ 72.

Because the defendant accepted responsibility and signed his plea papers before he appeared in the Eastern District of Virginia, *see* Plea Agreement, ECF No. 23 at 17, the PSR correctly notes (and the United States hereby moves) that the Court should further reduce his offense level by one point, resulting in a total offense level of 38. PSR at ¶¶ 74-76. With a criminal history score of zero, his criminal history category is I. PSR at ¶¶ 77-80. The sentencing table provides for a sentencing range of 235 to 293 months capped by the statutory maxima. The final Guidelines ranges are therefore 60 months for Count One and 235 to 240 months for Count Four. PSR at ¶¶ 95-96.

The parties also stipulated that the Court may impose a sentence in this case to run concurrently with any sentence imposed in the U.S. District Court for the District of New Jersey, No. 1:23-cr-470. PSR at ¶ 6.

**<u>SENTENCING RECOMMENDATION</u>**

The ongoing epidemic of ransomware attacks justifies a substantial sentence. As explained below, the Court's sentence in this case should not only reflect the severity of the malicious ransomware attacks launched by the defendant's Ransom Cartel conspiracy, but take account of the broader context, in which cybercriminals commit ransomware and other cyberattacks with impunity from overseas. Because the defendant pled guilty and accepted responsibility, the

statutory factors[3] justify a sentence at the low end of the Guidelines range on Counts One and Four, followed by a consecutive term of imprisonment for Count Six. The Court should impose a term of supervised release for each count, with special conditions including computer and financial monitoring. Finally, the Court should also require full restitution, forfeiture including a money judgment, and statutory special assessments.

### A.     The Court's Sentence Should Recognize the Seriousness of the Ransomware Threat

Ransomware is a plague. Its essence is coercion, plain and simple: "Give me what I want or I will harm you." From 2021 to 2023, the defendant organized and carried out the Ransom Cartel conspiracy, with a focus on United States victims. PSR at ¶¶ 25, 28. Ransomware attacks disrupt the communications networks that underpin daily life, cause substantial losses even with small attacks, and undermine confidence in technology. Just as the Fourth Circuit observed regarding financial fraud, ransomware harms victims "in almost irreparable ways by causing them loss of work, mental anguish, monetary loss, and loss of peace of mind. It raises costs for businesses, which must invest in security measures. These crimes require time and expertise to investigate and can be difficult to unravel and prove." *United States v. Carver*, 916 F.3d 398, 404 (4th Cir. 2019) (quotes and internal citations omitted).

---

[3] The statutory factors include: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed training, medical care, or other treatment; the kinds of sentences available; the kinds of sentence and the sentencing range established for the type of offense committed; any pertinent policy statement; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

The impact statements provided by victims of Ransom Cartel reflect typical consequences of ransomware attacks. Victim A (described above), for instance, was a medical technology startup that suffered a two-month total shutdown in the immediate aftermath of the attack, followed by months of additional impacts while it attempted to recover fully. Ex. A at 1-3. In addition to financial losses sustained during an attack like this, which can be quantified, employees of Victim A also suffered significant anxiety and stress, which cannot be quantified. *Id.*

Ransomware in one form or another has been a serious cybersecurity threat for more than a decade, and the threat continues to evolve. A report by a cryptocurrency analysis company estimates that the number of ransomware attacks in 2025 increased 50% compared to 2024, while identified payments to known ransomware cryptocurrency wallets fell slightly to $820 million. CHAINALYSIS, TOTAL RANSOMWARE PAYMENTS STAGNATE FOR SECOND CONSECUTIVE YEAR, WHILE ATTACKS ESCALATE, https://www.chainalysis.com/blog/crypto-ransomware-2026/. The report also attributes the drop in payments in part to coordinated disruptive actions by international law enforcement, including actions featuring participation by the U.S. Secret Service, FBI, and the private sector. *Id.* This indicates that law enforcement actions can and do influence the behavior of cybercriminals, who tend to be rational actors and are generally attentive to the consequences of their actions.

Ransomware makes up a large proportion of the cybercrimes reported to the FBI's Internet Crime Complaint Center (IC3) in 2025. FEDERAL BUREAU OF INVESTIGATION, INTERNET CRIME REPORT 2025, at 14, https://www.ic3.gov/AnnualReport/Reports/2025_IC3Report.pdf. Sixty-three new ransomware variants—spinoffs and modifications of other ransomware—were discovered by the FBI in 2025, meaning an average of 5.25 new variants were discovered per month. *Id.* The top ten most-reported variants primarily affected critical manufacturing, healthcare and public health,

and government facilities, with healthcare and public health the most often-reported victims. *Id.* at 16. According to one widely cited private sector analysis, the average cost of a ransomware incident is approximately $5.08 million. IBM, COST OF A DATA BREACH 2025, at 4, https://www.ibm.com/reports/data-breach. Meanwhile, the same report concluded, 60% of ransomware victims did not report their victimizations to law enforcement. *Id.* at 20.

The upshot of these statistics is that although the ransomware ecosystem continues to evolve and although law enforcement efforts to disrupt and deter continue to make an impact, investigators face an increasingly uphill battle as they attempt to collect evidence, identify victims, and charge ransomware attackers. This is in part because the vast majority of ransomware attacks are launched from overseas. Jurisdictional barriers delay justice as law enforcement navigates cross-border processes and limitations.  The Court's sentence in this case should therefore consider more than just the seriousness of ransomware in the abstract; it should consider that ransomware attacks here and nearly everywhere are carried out from around the world, often with impunity.

>**B.    The Court's Sentence Should Deter the Defendant and Others Like Him Who Commit International Cybercrimes**

The defendant did not commit his crimes alone, nor did he make any pretense of legitimacy. It is typical for cybercriminals to rely on others for work they cannot do themselves, such as writing custom malware, developing dark web sites, and procuring access to hacked computers. The defendant was no different. He used his network of cybercrime contacts to assemble and operate the Ransom Cartel gang. PSR at ¶¶ 26-28. He recruited individuals with special technical skills, organized the laundering of proceeds, and set up the technical infrastructure that Ransom Cartel needed to function. PSR at ¶¶ 24, 29, 33, 47. The defendant carefully established payment structures for co-conspirators such as commissions and a rewards program. PSR at ¶¶ 25, 37. From first to last, this was a carefully planned and executed criminal conspiracy that required substantial

forethought and intentionality. Even the defendant's December 2021 decision to rebrand and publicize his ransomware from "XXX" to "Ransom Cartel"—a romantic nod to price-fixing conspiracies—is revealing, as the name change reflects precisely the amoral, greed-driven mindset at the heart of these crimes. PSR at ¶ 35.

As the Eleventh Circuit has observed, "general deterrence is an important factor in white-collar cases, where the motivation is greed." *United States v. Hayes*, 762 F.3d 1300, 1308 (11th Cir. 2012); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal quotations and citation omitted)). While extortion does not exactly fit the mold of typical white-collar cases, the same incentive structure applies here. Cybercriminals who gather together to steal from others while hiding behind their keyboards are attentive to the risks of punishment, and have been observed to take seriously the ability of law enforcement to catch them. The Court should consider these broader realities as it seeks to effect deterrence.

The sentence must also deter the defendant himself, who made a calculated decision to start Ransom Cartel. And the defendant prospered, at least for a time. The defendant wore a Rolex and drove a Bentley Bentayga. PSR at ¶ 12. He lived in Switzerland and in Spain. PSR at ¶ 86. He extorted people from the comfort of his living room. Even after having his apartment searched and his assets seized, while pending extradition, he fled and attempted to re-enter Belarus. PSR at ¶ 86.

Although the defendant states that he was unemployed starting in 2021 or 2022, PSR at ¶ 93, it should be clear that Ransom Cartel was not just a response to a period of unemployment, a momentary lapse of judgment, or motivated by substance abuse. Ransom Cartel was a sophisticated criminal conspiracy designed to wrest millions of dollars from victims by imposing

10

carefully calculated harms. This conspiracy required a sustained level of criminal intent, which, as the defendant said at one point, was "fucking corporations, locking them, downloading their data and giving them nightmares." PSR at ¶ 20. Moreover, the defendant was a member of the notorious and elite Direct Connection cybercrime website while it operated from 2011 to 2016, with activity on the cybercrime forums going back to 2005. PSR at 20. The defendant's relationship to Ransom Cartel must therefore be viewed as an escalation of his prior involvement in the cybercrime underground rather than a brief misstep.

Since his apprehension, of course, the defendant has had time to reflect and has taken responsibility for his crimes. This is meaningful, and the Court should account for that fact in its sentence. Yet once released, the defendant will face temptations to return to a life of crime. As the presentence report shows, he has been highly mobile over the years. PSR at ¶¶ 85-86, 93. And because the defendant is likely to be deported immediately following his sentence, PSR at ¶¶ 13-14, the Court will lose the ability to monitor his transition back to the community or facilitate his rehabilitation through mechanisms like supervised release. The sentence imposed in this case must therefore be sufficient to accomplish the goals of sentencing, even without the benefits of supervision.

    **C.**    **A Significant Sentence Would Be Consistent with Other Sentences for International Cybercrime**

A sentence at the low end of the Guidelines on Counts One and Four, followed by the mandatory sentence on Count Six, would be in line with other sentences imposed in this District. As the Court is well aware, the Fourth Circuit discourages detailed comparisons of sentences in different cases because sentencing "is a quintessentially fact-specific and multifaceted exercise." *United States v. Friend*, 2 F.4th 369, 382-83 (4th Cir. 2021) (quoting *United States v. Rivera-Santana*, 668 F.3d 95, 105 (4th Cir. 2012)). "Courts have repeatedly made clear that comparisons

11

of sentences may be treacherous because each sentencing proceeding is inescapably individualized[.]" *Rivera-Santana*, 668 F.3d at 105. Nor does procedural reasonableness "obligate a trial court to engage in case-by-case comparisons of sentences imposed in cases unconnected to the case before the court." *United States v. Sueiro*, 59 F.4th 132, 142 (4th Cir. 2023).

With that qualification, the United States nevertheless notes that international cybercrime conspiracies focused not on malicious damage, but on financial fraud, have often received significant sentences in this District. *See, e.g.*, *United States v. Bondars et al.*, 1:16-CR-228-LO (E.D. Va.) (168 months for defendant who created and operated a tool aiding and abetting hackers); *United States v. Burkov*, 1:15-CR-245-TSE (108 months for operating two cybercrime websites that resulted in over $20 million in fraudulent purchases); *United States v. Tverdokhlebov*, 1:17-CR-9-TSE (E.D. Va.) (110 months for defendant who sold and trafficked sensitive personal and financial information on cybercrime forums); *United States v. Berezan*, 1:20-CR-145-TSE (E.D. Va.) (66 months for active participant in carding fraud websites who later participated in ransomware). Here, of course, the purpose of Ransom Cartel was to inflict highly disruptive damage to incentivize payment of ransoms. As such, these prior sentences are merely data points that the Court may consider as appropriate when determining the appropriate custodial sentence for the extremely serious crimes the defendant committed.

The Court should also impose the maximum term of supervised release available for each count. "Supervised release . . . is not a punishment in lieu of incarceration." *United States v. Granderson*, 511 U.S. 39, 50 (1994). Instead, it "fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000). Because the defendant's crime involved the sophisticated misuse of computers, the United States asks that the

12

Court impose the special conditions outlined in the PSR relating to computer and financial monitoring. PSR at ¶ 96.

**D.      The Court Should Impose Full Restitution, Forfeiture, and Special Assessments**

Pursuant to 18 U.S.C. § 3663A and the plea agreement, the defendant must pay restitution in the "full amount of the victims' losses as determined by the court." PSR at ¶ 10. Restitution includes all losses "directly and proximately harmed" by the crimes of conviction. 18 U.S.C. § 3663A(a)(2). Here, the defendant conspired with others around the world to target the United States, along with other western nations, for computer intrusions. This caused all sorts of losses, including cybersecurity incident response, remediation, attorney advice and counsel, and other necessary costs of responding to the incident.

Several of the identified victims in this case submitted detailed restitution requests, and the total amount for those victims is reflected in the presentence report. PSR at ¶ 46. The United States also requests forfeiture of specific assets and a money judgment. *See* PSR at ¶¶ 11-12. Finally, the United States respectfully requests that the Court impose a combined $300 in special assessments for the defendant's convictions, all pursuant to 18 U.S.C. § 3013.

(This space intentionally left blank.)

13

## **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court impose a sentence at the low end of the Guidelines range on Counts One and Four, the term of imprisonment for Count Six, supervised release, full restitution, forfeiture, including a money judgment, and a special assessment for each count.

Respectfully Submitted,

Todd W. Blanche
Acting Attorney General

Theophani K. Stamos
First Assistant United States Attorney

By:                    /s/
Jonathan S. Keim
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Fax: (703) 299-3981
Email: jonathan.keim@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 29, 2026, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system, which will send a notification of such filing ("NEF") to counsel

of record in this case.

I further certify that on July 29, 2026, I sent a copy of the foregoing to counsel of record

and the U.S. Probation Officer assigned to this matter:

    Jennifer D. Lyerly
    United States Probation Office
    Email: Jennifer_Lyerly@vaep.uscourts.gov

_____/s/_____
Jonathan S. Keim
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Fax: (703) 299-3981
Email: jonathan.keim@usdoj.gov
